Argued February 9, affirmed March 20, 1917.

# BENNETT *v.* BENNETT.*

(163 Pac. 814.)

**Husband and Wife—Partnership—Burden of Proof.**

1. Where husband claimed property held in wife's name by virtue of an alleged oral partnership agreement with her, the burden rested upon him to prove such relation by clear evidence, and such burden was greater, since the partnership was alleged to be between husband and wife.

**Husband and Wife—Partnership—Sufficiency of Evidence.**

2. In action by husband to establish a partnership between himself and his wife and to divide certain alleged partnership property held in her name, evidence *held* insufficient to establish the partnership, where only two witnesses testified to wife's admission of the partnership, which evidence by Section 868, L. O. L., is required to be received with caution, and all other evidence showed that practically all property was purchased with the wife's money by husband acting only as her agent.

     [As to partnership in business between husband and wife, see note in 31 Am. St. Rep. 935.]

---

*For cases discussing the question of partnership between husband and wife, see note in 16 L. R. A. 526.       REPORTER.

From Clatsop: JAMES A. EAKIN, Judge.

Department 1.    Statement by MR. JUSTICE HARRIS.

C. N. Bennett is prosecuting this suit against his wife Emma K. Bennett for the purpose of establishing a partnership between them and to secure a decree marshalling and dividing the alleged partnership assets.    The complaint avers that the husband and wife verbally agreed to purchase certain cranberry lands in Clatsop County, to sell portions and to improve and raise cranberries on other portions of the land.    The pleading speaks of two tracts of land: One is known as the West place and the other as the railway eighty. The complaint recites the history of the acquirement of these two tracts of land, explains that both were conveyed to the wife in trust for the partnership, tells about selling portions of the West place, recounts the story of the formation of a corporation known as the Clatsop Cranberry Company and the issuance of twenty-five shares of the capital stock to C. N. Bennett for the benefit of the partnership, avers that a donkey-engine, cars, tracks and tools are on the West place and that the title to the railway eighty and to the unsold portion of the West place is now held by Emma K. Bennett in trust for the partnership.

The defendant denies the making of a business partnership with her husband and says that she is the individual owner of the equipment on the West place and of all the land in her name, and that the plaintiff holds the twenty-five shares of Clatsop Cranberry Company stock in his name for her benefit.    The answer concludes with a prayer that she be adjudged to be the owner of all the property in controversy.

A trial resulted in a decree for the defendant and the plaintiff appealed.                    AFFIRMED.

For appellant there was a brief over the names of *Mr. Edward E. Gray* and *Mr. J. Q. A. Bowlby,* with an oral argument by *Mr. Gray.*

For respondent there was a brief and an oral argument by *Mr. James L. Hope.*

MR. JUSTICE HARRIS delivered the opinion of the court.

1. The husband asserts and the wife denies the making of a business partnership agreement. He alleges that they discussed the terms "during the winter of 1910–11" and "on or about the 12th day of July, 1911," they "made and entered into a verbal agreement" of partnership. He testified that they discussed the cranberry venture from time to time during the months of February, March, April and May in 1911. He was unable to fix the date upon which the partnership agreement was concluded further than to say that an agreement was reached at some time between February 1 and May 24, 1911. According to his version he was to give his time and personal services to the partnership, she was to furnish the money required by the firm, and they were to share equally in the profits and losses. The whole controversy hangs around eighty acres of land referred to as the railway eighty and a tract embracing 199.3 acres known as the West place. A history of the railway eighty and the West place is largely a history of the alleged partnership; but as a preliminary to the story of the purchase of those two tracts of land a brief narrative may be given of the financial affairs of the parties beginning with the date of their marriage.

The plaintiff and the defendant were married in Pennsylvania on February 21, 1897, when he was about

21 years of age. He was a civil engineer earning less than $100 a month while her "parents were in pretty good circumstances." Apparently he advanced in his profession with the progress of time for in 1907 he was the chief engineer "of four different street railway companies and a bridge company." However, she testified that he was without employment during the year immediately preceding his coming to Oregon. A corporation known as the Astoria, Seaside & Tillamook Railway was organized for the purpose of constructing a railway from Astoria to Seaside and other points, and in March 1910, C. N. Bennett came to Oregon to assume the management of the corporation at a monthly salary of $250, having been sent here by the stockholders most if not all of whom resided in Pennsylvania. The plaintiff admits that when he arrived in Oregon he had practically no property or funds. His wife and children followed him and arrived in this state in July, 1910. At the time of her marriage and at different times afterwards her father gave her substantial sums of money and also a lot. Her father died in 1904, and she inherited property from his estate. Her brother died and she was a beneficiary. When she came to Oregon in 1910 she owned, as a result of those gifts and inheritances, which were supplemented by a fortunate investment, a house and lot in Pennsylvania free from encumbrance, worth from $5000 to $7500, 80 shares of stock in the West Side Electric Street Railway valued at $4000, although it was afterwards sold for $5000; and stock in the Klein Logan Manufacturing Company appraised at $7500. There is some dispute concerning the source of the money used to acquire the West Side Electric Street Railway stock but the ultimate fact nevertheless remains that the plaintiff concedes that this stock was a part of

the "Emma K. Bennett Capital" and all the book entries made by him concerning it are admissions that she had at least a $4000 interest in the stock. Upon their arrival in Oregon the husband had practically no resources except his salary while the wife was worth from $16,500 to $19,000 with no indebtedness.

The plaintiff continued in the service of the Astoria, Seaside & Tillamook Railway until about the middle of October, 1910, when he quit on account of the insolvency of his employer. The railway eighty was originally owned by a certain corporation which for convenience will be called the receiver for the reason that it was in the hands of a receiver. The receiver owned the railway eighty and claimed some interest in certain surveys or rights of way. At some time during the summer of 1910 the plaintiff obtained an option on the railway eighty together with the rights of way for the benefit of his employer by paying $500 to the receiver. The Astoria, Seaside & Tillamook Railway became insolvent and was unable to take up the option. C. N. Bennett says that upon learning of the insolvency of his employer and in order to save the salary then due him, amounting to about $500, he arranged with the receiver for the purchase of the railway eighty in his own name. The plaintiff testified that $2000 was the agreed purchase price and that, with the consent of the Astoria, Seaside & Tillamook Railway, $500 of that sum was paid by the receiver crediting to the plaintiff the $500 previously paid to the receiver on the option. The remaining $1500 was paid in cash, the defendant furnishing $500 from her own funds and the plaintiff providing $1000 which he borrowed from the Scandinavian American Savings Bank of Astoria by giving his promissory note. The receiver conveyed to C. N. Bennett on September 14,

1910, and on September 17, 1910, the plaintiff and the defendant deeded the land to the Scandinavian American Savings Bank for the purpose of securing the loan made to the plaintiff. The $1000 note to the Scandinavian American Savings Bank was paid with funds which Emma K. Bennett borrowed in December 1910 from the Bank of Charleroi in Pennsylvania by giving her promissory note with her West Side Electric Street Railway stock as collateral. Upon payment of the C. N. Bennett note and by his direction the Scandinavian American Savings Bank transferred the land to H. W. Hagmeier, a brother-in-law of plaintiff, and afterwards on October 3, 1911, Hagmeier deeded the land to Emma K. Bennett. In the final analysis $1500 of the purchase price of this land was furnished by Emma K. Bennett. The plaintiff insists that he indirectly furnished $500 of the consideration for the land by reason of the receiver having credited the $500 previously paid on the option to the Astoria, Seaside & Tillamook Railway. It is a noteworthy fact, however, that in the three trial balance sheets for the year 1912 which he prepared as well as the loose leaf ledger which he opened at some time in 1912, the $500 credit now claimed by plaintiff is not charged against the land while a charge is made for the $1500 cash payment. Moreover, in 1914 the plaintiff himself prepared two typewritten contracts for slashing this land, one with E. L. Williams and the other with Earnest Dawson. Each contract opens with the statement that "It is hereby agreed between Emma K. Bennett, owner and" the contractor. Each contract is signed by Emma K. Bennett and neither one is signed by C. N. Bennett. It is conceded by both parties that Hagmeier never had any interest in the land and that he was used as a mere conduit through whom the title

was conveyed. The deed to Hagmeier was made for the purpose of placing the land in the name of a third person in order to avoid any complications which might result from the insolvency of the Astoria, Seaside & Tillamook Railway. The plaintiff says that when he and his wife agreed upon a partnership it was understood that the railway eighty would be considered as partnership property; and that he caused the title to be transferred to his wife as a matter of convenience. The defendant contends that the land was deeded to her because her money paid for it and because it belonged to her. In passing we recall that on cross-examination the plaintiff went no further than to claim that at the time of making the partnership agreement he considered that he had an interest in the railway eighty; and, although this land was purchased prior to the making of the alleged partnership agreement, nevertheless, when asked whether he considered that he owned the land when the partnership was formed he answered: ''Well, I don't know that I did.''

The West place embraced 199.3 acres. ''Without putting up any option money,'' C. N. Bennett obtained an option on the West place on February 28, 1911. The option was followed by a contract of sale and it in turn was succeeded by a deed to Emma K. Bennett on July 28, 1911. When the contract of sale was made Emma K. Bennett gave her personal check for $100 to Paul H. West as ''earnest-money.'' The agreement provided for the payment of one-third of the purchase price at the time of concluding the agreement, a note for one third payable in one year and a note for the remainder payable in two years. The first payment was made by Emma K. Bennett who gave her check on her personal bank account and she gave her promissory notes for the other two install-

ments. C. N. Bennett did not sign either note. Both
notes were subsequently paid by Emma K. Bennett
who gave checks on her personal bank accounts. She
obtained funds for the payment of the first installment
by mortgaging her home for $4000 to Henry Yost. In
1912 and 1913 the Bennetts conveyed portions of the
West place to different persons each of whom gave
notes and mortgages for such part of the purchase
price as was not paid upon delivery of their respective
deeds. Without exception the notes were made pay-
able to Emma K. Bennett.

The defendant insists that she is the owner of the
Clatsop Cranberry Company stock involved in this
controversy. The company was organized for the
purpose of raising cranberries. C. N. Bennett sub-
scribed for 25 shares in his own name notwithstanding
the fact that he claims his subscription was for the
benefit of the partnership. This stock was paid for
by deeding 16 acres of the West place to the company
and paying $1216 in cash. The plaintiff says that the
partnership furnished $500 and that he borrowed
$716 and surrendered the Cranberry Company stock as
collateral security for the loan. The defendant says
that she did not learn that the stock had been taken in
the name of C. N. Bennett until seven or eight months
after the issuance of the certificate.

The circumstances of the acquirement and disposi-
tion of the West Side Electric Street Railway stock
may throw some light upon the business relations of
the parties. The street railway stock cost $2500. The
plaintiff says that the funds for this investment were
obtained by mortgaging the home. The defendant
emphatically states that no mortgage was placed on
the home until the execution of the Yost mortgage on
May 24, 1911, and that the street railway stock was

purchased with moneys which she inherited from the estate of her deceased brother Ed Klein. She says and he does not deny that the stock was issued in his name; and she testified that it was not until several months afterwards that she learned of the fact that the stock had been issued in his name; and that it was only after continued insistence that she succeeded in having the stock transferred to her. It will be recalled that in December 1910 Emma K. Bennett gave her note for $1000 to the Bank of Charleroi with the West Side Electric Street Railway stock as collateral, and used the money to pay the C. N. Bennett note held by the Scandinavian American Savings Bank of Astoria. In April, 1911, the plaintiff negotiated a sale of the street railway stock to C. F. Thompson for $5000. Of this sum $2000 was paid to the Bank of Charleroi to satisfy two notes, one of which was the $1000 note given by the defendant in December 1910; the plaintiff kept $1000 and invested the remaining $2000 in the Key Construction Company. C. N. Bennett explains his retention of the $1000 by saying that he figured that he had an interest because the investment was made through his influence with the company issuing the stock and that it was he who made the profit although he used her money. She says that she had understood that the stock was sold for $4000 and that it was not until the time of the trial that she learned that it had been sold for $5000. His testimony on this subject cannot but attract attention. When asked "how much the stock was sold for," he answered by saying: "I think it was in the neighborhood of $4000" and afterwards admitted that he sold the stock for $5000. The plaintiff does not claim that his wife held any interest in the Key Construction Company investment; in that venture he concedes that he used $2000

of her money but says that he regarded it as a loan. The Key Construction Company investment was disastrous and the $2000 was lost within a period of four months.

Hundreds of checks, check stubs, bank statements, a sort of journal, a so-called loose leaf ledger, another loose leaf book, and many other papers were received in evidence. The three books were kept by the plaintiff and he says that he commenced to keep books in the middle of 1912 making entries, however, of all transactions dating from July, 1910. The entries in these books relate to the home, the street railway stock, the Klein Logan Manufacturing Company stock, the railway eighty, the West place, family expenses, and also individual expenses of the plaintiff. There is not a word in any of these books tending to show that C. N. Bennett, who kept the books, regarded the railway eighty and the West place as partnership property or that he dealt with that property any different than he did with the railway stock or the Klein Logan Manufacturing Company stock. He does not claim that he kept books as partnership books, nor, indeed, does any book bear the slightest trace of a partnership.

The plaintiff counts much on the account carried in the First National Bank of Astoria. This was a joint account opened in 1913 in the names of the plaintiff and the defendant. The plaintiff caused some checks to be printed with his name and that of his wife in the upper left-hand corner. Each of these checks was invariably signed by one and countersigned by the other. The plaintiff says that the purpose of this account was to segregate the partnership business. An examination of these checks will disclose, however, that some were for family expenses, some were payable to the plaintiff and others to the defendant, two

were for interest on the Yost mortgage and others were on account of expenses connected with the West place. Notwithstanding the avowed purpose of the First National Bank account an examination of the checks in evidence will show that most of the expenses incurred after opening the joint account and connected with the railway eighty and the West place were paid with checks drawn by Emma K. Bennett on her personal account with the Scandinavian American Savings Bank. Moreover, one of these checks on the First National Bank is evidence against the contention of the plaintiff that the West place and the railway eighty were owned by himself and wife as partners. A check was signed by the plaintiff and countersigned by the defendant on September 29, 1913, payable to J. V. Burns, Sheriff, and written at the bottom of this check in what is apparently the handwriting of the plaintiff is the following:

"½ taxes property Emma K. Bennett Jewett D. L. C.........34.12
 ½    "         "       "    "    "    Judson D. L. C. ....... 8.71
                                                              _____
                                                               42.83"

The railway eighty is in the Judson Donation Land Claim while the West place is in the Jewett Donation Land Claim.

In brief when the parties came to Oregon in 1910, C. N. Bennett was worth practically nothing while Emma K. Bennett owned a home, street railway stock and factory stock of the aggregate value of $19,000, with no indebtedness. Now the railway eighty and what is left of the West place are in the name of the defendant with a mortgage of $2000 on the former and a mortgage of $3000 on the latter. The home is mortgaged for $4000. The railway stock has been disposed of, a part of the proceeds paying for the indebtedness incurred on account of the railway eighty and the re-

mainder dissipated. She made the first payment on the West place by mortgaging her home; she paid the second installment with moneys derived from sales of portions of the West place and she borrowed funds for the final payment. She paid $500 of the original purchase price of the railway eighty and finally her money paid one thousand dollars more. The books opened by the plaintiff in 1912 do not charge the railway eighty with more than $1520.65 for the year 1910; the sheet headed "Trial Balance E. K. B. June 30, 1912," as well as the one labeled "Trial Bal. Dec. 31, 1912," both of which were prepared by C. N. Bennett, charges the railway eighty with only $1520.65, and no mention is made of a $500 charge against the land on account of a $500 credit to C. N. Bennett arising out of unpaid salary for services rendered to the Astoria, Seaside & Tillamook Railway. The sheet headed "Trial Balance E. K. B. June 30, 1912," lists both the West place and the railway eighty among the assets. The books kept by him exhibit no signs of a partnership but on the contrary so far as shown by the books his treatment of the West place and railway eighty did not differ from his treatment of the home, the street railway stock and factory stock which he concedes belonged to his wife. The Clatsop Cranberry stock was issued in payment of land which was in her name; $1216 in cash supplied the balance of the consideration; the husband borrowed $500 of this sum on his note to the Astoria National Bank but on May 3, 1913, she paid this note, principal and interest, by giving her personal check on her account in the Scandinavian American Savings Bank; and the husband borrowed the remaining $716 by giving his note for that amount with the stock as security. He contends that he was her business partner in the railway eighty and the

West place. He concedes that she owned all the other property. She insists that in all the transactions concerning the lands in dispute he merely acted as her agent, as a husband for a wife. She points out that from the time of their marriage until July, 1914, she left the management and supervision of her business affairs to her husband and that at all times he dealt with her property as a husband and not otherwise. Her version of his relation to the property was made plain when she testified:

"Well, Mr. Bennett always handled my affairs from when we were first married, the business affairs, and from the very first, when we bought the first home, he handled my business affairs and estate, and he handled it as a husband would for a wife. * * He simply acted as a husband would for a wife, took the managing of the thing and that went on and I knew very little about it, as I say, when there was a note to be signed or a mortgage, he would come in and say: 'Now, sign this, this is for so and so, I need this money, this is for this. And I need this money.' That was as much as I ever knew what was going on in the business."

2. The burden is upon the plaintiff to prove a business partnership: 30 Cyc. 402. It must be remembered that this is not a suit by a third party but it is a suit by one who asserts that he is a partner of the person sued and consequently since there is no written agreement the plaintiff must establish the existence of the partnership by clear proof: 30 Cyc. 413; 9 Ency. of Ev. 551; and the burden assumed by the plaintiff is still greater for the reason that he is claiming a business partnership with his wife: 9 Ency. of Ev. 554; *John Bird Co. v. Hurley,* 87 Me. 579 (33 Atl. 164.)

It is not necessary to discuss the legal question, so ably and exhaustively debated by counsel, of whether the statute of frauds forbids evidence of the alleged oral partnership agreement; but it is enough to say that the plaintiff has failed to submit the degree of proof required of a husband when he claims a business partnership with his wife. We have not overlooked the evidence of the two witnesses who testified that the defendant admitted that she was a partner in the controverted lands. The defendant vigorously denied the statements ascribed to her. The statute directs that this character of testimony must be received with caution: Section 868, L. O. L. Moreover, it is not to be forgotten that the plaintiff claims that a partnership agreement was made in 1911 and it must be remembered that the defendant did not assume exclusive management of the property until July 1914, and that this suit was not commenced until September 18, 1914, and yet only two persons were produced to testify to admissions of a partnership notwithstanding the fact that defendant was on or in the vicinity of the lands nearly all of the time and signed most of the checks that paid the bills. The plaintiff has failed to submit sufficient evidence to meet the requirements imposed upon a husband when he attempts to establish a business partnership with his wife. The decree is affirmed.                                    AFFIRMED.

MR. CHIEF JUSTICE McBRIDE, MR. JUSTICE BENSON and MR. JUSTICE BURNETT concur.